Our final case for argument today is 24-2118 Willis Electric vs. Polygroup. Mr. Jakes. May it please the court. We raise two issues on this appeal, obviousness and damages. I'd like to start with the obviousness question. We started in this case, there were over 100 claims, multiple IPRs, and we're down to one claim, claim 15. And the facts here and the evidence I think should lead the court to conclude that claim 15 would have been obvious. Let's start with the things that are fairly sure. There's no dispute over the scope and content of the prior art. The Loomis GKI tree is in the prior art. Barrel connectors, coaxial connectors were well known. Willis' experts said they were standard, well known, readily available. So we know that, and there's no dispute in the record on that. The Loomis GKI tree and a coaxial barrel connector, those two in combination meet every limitation of claim 15. I don't think there's any dispute as to that either. Again, Willis' expert, Dr. Dickens, said to use a coaxial connector. A lot of issues to cover. Can we just jump to the motivation to combine? I was just getting to it. Thank you, Your Honor, because that's really where the issue is. We know from the record here, the trend in the industry was toward LED lights, and they use low voltage DC power. Coaxial barrel connectors, a common way to connect the low voltage. Yes, but this is not a question of law. This is a substantial evidence question. It is a substantial evidence question. The board cited particular pieces of evidence, which you and I can walk through right now, because that's what I'm struggling with. It's not for me to decide whether I agree with you that a skilled artisan would make this combination, or would be motivated to try it, or anything else. It's whether there's substantial evidence for the board's fact finding contrary to what you're arguing. Can we really just focus on that? The board pointed specifically to facts and expert testimony about the many design challenges that would be faced with attempting to make this modification that would lead a skilled artisan away from considering the combination. The board also ultimately concluded there was even a teaching away, because the original reference, the notch and dimple design was the novelty of it, and you'd have to abandon that novelty to now make this change. And the board found that all of those facts led it to conclude that there was not a motivation to combine. And I have to say, do those facts, which the board pointed to, constitute substantial evidence? And it seems like evidence. Whether I agree with it is not the question, but it seems like evidence. It is evidence, but it's not relevant evidence. It's not evidence that shows that there was no motivation to combine. The district court here looked at the evidence, which the jury also considered, and specifically said that you would have to make design or structural changes. That's not the test. We've characterized that as bodily incorporation. I'm sure the district court didn't use that term. But if you look at the two pages of Dr. Dickens' testimony, and that's really what it comes down to, you look at the reasons he gave that someone wouldn't combine these two. They have to do with physically incorporating a coaxial connector into the luminous GKI tree. So he says there's such things as you'd have to redesign the connector housings. You'd have to adapt the tree to use coaxial connectors. There would have to be necessary design changes. Those are the things that the district court cited. Those are not reasons that are contrary to a motivation to combine. The test isn't whether the combination would require design or structural changes. This court's law on bodily incorporation has said that many times. It's whether the references together would have taught what's claimed. What would have been obvious. Not that you had to be able to physically change one for the other. Sure, there would be design changes required. For example, the molding would have to be changed. That was well within the skill of the art. It doesn't affect the motivation to combine. The fact that you would combine a coaxial barrel connector with the luminous GKI tree. Now the use of coaxial connector here, it would actually reduce the manufacturing steps. You don't need the dimple or the slot. So that's not something that would teach away from the motivation to combine. In fact, I don't think you'll find that the district court said anything about teaching away. The most you'll find in the record is again, Dr. Dickens. I think there's a stray statement where he suggests that the prior art taught away because it didn't essentially come up with the invention. That again is also not the test. An alternative design. Let's look at that. It's on page 2636. Yes. That's where the expert said, looking at these two, there was no motivation to do it. And he says, in fact, it was teaching away from it. The GKI luminous tree was teaching to put this fixed orientation in there, a better design of the fixed orientation. Now all of a sudden, we're going to completely go away from all those teachings where it taught how to do that and come up with something totally new. That's an invention. That's what he said. And that's the sum and substance of teaching away. That's not what the law requires for teaching away. There has to be criticism or somehow derogation of what was suggested. Well, he says that basically the notch and dimple prior art was the novelty, and that would have destroyed the entire notion of the luminous GKI tree's basic objective. And so why would a skilled artisan make this combination which would really move completely away from the novelty of this Christmas tree? What a great time for this case. It is. It is a great time. Very appropriate. Well, you don't need the dimple or the slot if you use a coaxial connector. That sounds kind of like hindsight. The question isn't, do you need it? The question isn't, could somebody jump through all these different steps to get it done? The question is, would a skilled artisan be motivated to do that? And this expert said, no, they wouldn't. It's just, you're fundamentally disregarding the novelty and the importance around this patent. You wouldn't look at it and then say, let's throw out everything they did that was good and make all these changes to get to this invention. That feels very hindsight-like to me, and that's a concern for me, especially in, I don't mean to degrade your client, but it seems relatively simple to at least understand technology. It is. Well, first of all, we're talking about an actual product, the luminous GKI tree. And the expert saying that the objective of it was a slot and a dimple, that's not what the designer of it said. He said the objective of his tree was internal power. But see, that's a question fact. I can't, I'm not going to overturn an expert witness that's talking about what he perceives the novelty to be. Of this tree. Right. Well, I don't think that's the right way to look at it, because this court's case law on teaching away says, just because there's an alternative design doesn't mean that teaches away. And what we have is an alternative design that use incandescent lights, and because of that, needed an alignment feature. When you go to low power LED lights, you can use a low power connector. You don't need those things. These trees, when they make them, they don't start with a slot and a dimple. You have to add those. And so, when you're adding a barrel connector, you just don't perform those steps. That's not teaching away. That's something of a motivation to combine. As long as you're motivated to use a barrel connector, which you would be for low power LED, there's no reason you couldn't put it into the Loomis tree. And even their expert said, I'm not saying you couldn't do it. So, there's nothing like we have no expectation of success here. It could readily be done. What's the motivation to do it? The industry trend was towards low power LEDs. You don't use two prong high voltage plugs for that. The most common one available was a barrel connector. You use a barrel connector, you meet every limitation of the claims. But the question isn't, is it a good idea to combine LEDs and coax cables? The question is, would somebody have modified this one piece of prior art in this other way? How is it not relevant for the expert to say, this would require way too many changes? A skilled artist wouldn't do this and he wouldn't move away from the primary objective of that first tree because he or she would be starting with the notion that this is what was important about it. And you wouldn't just abandon what was important about it. But it's a question of fact. That's my saying anything unreasonable. I'm just not sure that it's my place to overturn those kinds of fact findings. I understand, Your Honor. I think the way to look at it is that expert's testimony and what the district court relied on is not substantial evidence to support the jury verdict because it does not negate a motivation to combine. To say you need to make physical design changes in order to incorporate a barrel connector is not the test. That's why we called it bodily incorporation. And this court has said, just because you would need to make those changes doesn't mean it's not obvious to combine them or that there would be a motivation. But you did present all this to the jury, is my understanding. That's right. And so for us to grant relief that you're asking for today, we need to find, I think, that no reasonable juror could have concluded anything other than that you proved a motivation to combine by clear and convincing evidence. That's right. And we think on our side of the ledger, it's there. On their side, they have the two pages of the expert's testimony which rely on irrelevant facts that you would have to make physical design changes to the tree. That does not negate a motivation to combine. That's something that's within the skill of the art. But to be clear, the motivation to combine and the analysis of obviousness was all in the jury instructions? There was no objection to the jury instructions. They got the standard instructions on obviousness.  But this evidence doesn't measure up. I'll turn to damages if I could briefly. Here we have an apportionment issue with Boaz's damage expert not apportioning down to claim 15. So I said we started out with there were 100 claims, multiple patents. We ended up with one claim and no attempt at all to apportion down to the value of that claim as compared to what was in the prior art, which included internal power, which was in claim 10. And the expert didn't do that. Now, I'll give you one example. One of the things Ms. Riley did is she compared, she looked at the profits on Willis's one-plug trees versus non-one-plug. And one-plug means has internal power. There are many other features that are associated with one-plug trees that are not with non-one-plug trees. It wasn't an apples to apples comparison. What there was, and which they could have done, there were one-plug trees that used coaxial connectors and there were one-plug trees that used two-prong connectors. She could have compared those and she didn't. That would have been something that would have apportioned down to claim 15. Did you all bring this up on cross-examination? There was a lot of cross-examination about claim 15. I don't know that we asked the question of why you didn't do it this way. But you had the opportunity to elucidate this problem in her methodology, both at the Daubert stage and also in front of the jury. You had the opportunity to point out that she has swept into her analysis trees that might not even infringe this claim. That came out very clearly. It was mentioned many times that one-plug trees included non-coaxial connectors. Even the district court said it in the opinion on JMOA. Here's my problem with this and treating it as a methodological flaw that ought to result in a you've teed up a circumstance that's going to make it almost impossible for a patentee to ever prove damages because there's always going to be some different features. Maybe this one's red and this one's blue. Like you said, this case involved a lot of claims, a lot of issues. Can we really expect the damages expert to account for every single variation between products? The methodology is at best an estimation, an attempt to guide. My problem is you've identified problems, absolute problems, clear problems with her methodology. But I'm just not sure those problems are meant to be solved at the methodological Daubert step as opposed to given to the jury to take into account when assessing the credibility to give her numbers. Well, I think Rule 702 says that it has to be handled at the Daubert and the initial stage.  Because it has to do with reliability of the expert's opinion. The law is very clear that But there's uncertainty about what impact these issues you're raising has on the outcome of her damages analysis. I mean, there's just much about any damages analysis that involves uncertainty in the apportion of space. I'm really anxious about EcoFactor, not the one today, but the one that we issued and damages. I'm really anxious about that ending up with too broad a sweep and making damages virtually impossible for a patentee to ever offer testimony on because of factual contentions of error in underlying expert testimony. And so how can you assuage me that there's, like, what is your best? You have a lot of things that you point to that you think are wrong with her testimony. But like, what's your best one that you think is absolutely a methodologically unsound problem that ought to the 702 level and ought to implicate Daubert as opposed to the kind of thing that creates a fact question that a jury ought to be able to consider? What's your best of all your errors? What's the one? Because we don't have a lot of time, so let's talk about the one that seems most methodological. Well, I did mention the profits on the one-plug trees. I think that one is something that could have been done differently to compare apples to apples, and she did not. She compared one-plug that had both coaxial and non-coaxial to non-plug. That's just wrong. Apportionment requires apportioning down to claim 15 and not including what's in claim 10, which is invalid. There was no attempt to do that. That's methodologically unsound. What do you mean? You mean there were products... I don't understand that argument. I'm going to give you more time. Don't worry about that. You're our last case. Help me understand what you mean by that, the claim 10 versus claim 15 because, again, Mr. Jakes, you represent people on both sides. I do. We can't have patentees have this ridiculous burden to try to demonstrate any entitlement to damages. They have to somehow tether everything, not just to a patent, but to a claim. What does that mean? Does that mean that other licenses, if they're to the patent, have to be thrown out because those licenses were to the patent and not to a particular claim within a patent as a comparator? Do you see... I do. I'm concerned that many of these little errors that you've identified would spiral into a scenario that would make damages impossible to ever establish. I don't think it's impossible. I think in one sense, it's up to the experts to do the economic analysis. Now, if I would point to the Prolitech case, which we thought was very helpful. It's Judge Bryson's opinion from the district court. Not my name, but very educational, where he said we have dependent claims. You have to be confined to the value added by the dependent claim, not the invalid independent claim. The expert had to do that. Now, I hear you. Let's go back to my hypothetical, though. Could you use a comparator license that was a license to the patent when some of the claims to the patent, in fact, the more broad ones, have all been invalidated? Now, does that mean that license gets thrown out and it's methodologically unsound to rely on it because you can't prove that the value of that license flowed by virtue of that one dependent claim? This is the very practical, real-world problems I'm worried about causing based on some of the arguments you've made. Let's look at the H.S. Kraft license, which is the one the expert said was the most significant. It was to multiple patents and patent applications, not confined to either this particular patent and obviously not confined to Claim 15. Now, there was no effort to apportion. No, but go back to what, but I understand and I know why you want to tether it to that, but my concern is the rule that you're asking for is going to create that situation I just described, where if you successfully invalidate a bunch of the claims in a patent, now the next argument is going to be you can't rely at all on these licenses because there's no reason to think those licenses were to claim, only to Claim 15 or that this person needed Claim 15. You understand what I'm saying? I do. I'm worried about, I'm not as worried, I know I should be worried about your case, I am worried about your case, but I'm also worried about the implications that a decision has in this case. I understand. So just looking at that H.S. Kraft license, I think there are two things. One, in this case, it was not comparable and should have been thrown out. Why? It was to the same patent. Because it did not, because the expert did not apportion. If she had... So the license can't be thrown out. It doesn't matter what the damage is, even if the expert didn't testify. The expert would have to testify because otherwise the jury is left at sea with an agreement that they don't know what to do with. The expert has to explain how that relates to the claim that's at issue and say, look, it covers all these features, but the claim at issue only covers the use of a coaxial barrel connector. Now, it got two dollars for allowing some apportionment, and this is what economists do. They figure out what's the value down to this one feature. We see it all the time in multi-feature products. This is a feature, a barrel connector that no one sees inside a Christmas tree. Now, I understand your concern. I think one of the problems is, in a lot of cases, there will be very little value ascribed to these if you do a true economic analysis. I think that's the case here, where reasonable royalty might be ten cents rather than four dollars. But in that HTS, is that right? HS-Craft. HS-Craft license. Sorry, I'm going to get myself. But in the HS-Craft license, the expert agreed that the license had differences from what was going to be licensed in this case. She did not give a detailed analysis, really any meaningful analysis for sure, but she definitely agreed it would be different. And also, wasn't her royalty rate less? I don't remember what the potential was. No, it wasn't, actually. But in the end, it was. Her royalty rate was less. It wasn't. The agreement has two dollars in it, and she gave an opinion that a reasonable royalty would be five dollars. She used the Georgia-Pacific factors, qualitative factors using up arrows to boost the reasonable royalty to five dollars from the two-dollar license. When you say up arrows, what do you mean by that? It's a typical thing that experts do. They go through the Georgia-Pacific factors and say, this one would result in an increase, and they put an up arrow next to it. And this factor would result in an increase, and they put an up arrow next to it. And do you think there's something wrong with that? Well, it's not a substitute for apportionment. I think this court's Zhijiang Superlighting recently said that. That was all ditto. Well, it specifically called out the up arrows and the down arrows as not being a substitute for an unreliable opinion. You can't just invoke Georgia-Pacific and say, oh, I considered this license and increased the royalty to five dollars. That's not apportionment. She had to do more than that to get down to claim 15. And simply starting with that agreement, maybe there's a way to using that agreement. As it stands, it's not comparable because the expert didn't do the correct comparison. Why? Why isn't saying the fact that this patent cover, or this license covered multiple patents, and the license here, hypothetical negotiation, reasonable royalty right here, would be just to this patent. So by virtue of that, I'm going to put a down arrow on this, because how? I mean, I feel like, again, my big concern is it's kind of easy to criticize these things. And it seems hard for me to imagine how any expert could do it more precisely without it being completely speculative and unfounded. Like how to determine what an individual license is and the rate of the rate, especially because you don't even know what really mattered to the licensee in that case. In that particular case, that licensee understanding what really mattered to them, maybe the rest of the patents were thrown in just because that happens a lot, right? That's true. So it's just hard. The problems you're describing seem very hard for me to wrap my head around how patentees would survive and ever be able to prove damages if I said all these little things that you're identifying are problems and that they needed to do this much more, and this much more, and this much more. I'm really, I'm kind of terrified. I understand that. I think the plaintiffs will find a way. I mean, you might put yourself right out of a job if you win. I think the plaintiffs- There'll be no more damages, just like there's no more injunctions. Now there'll be no more damages. I think the plaintiffs and their experts will find a way, but they have to make the effort, and that's clearly what's lacking here, is there was no attempt to apportion. Now I could come up with ways that they could have done it, and maybe we'll see those on remand if we're successful in convincing you that we should get a new trial. Maybe we'll see how they do that apportionment down to claim 15 and the use of a coaxial connector. There are things like surveys. There's comparing the profits, apples to apples. There's comparing the cost. Does this one cost? It's the kind of thing economists do. So when you think that she compared the wrong thing to the wrong thing, that makes it methodologically unsound, as opposed to a question that can be brought out and elucidated for the jury, because there's no doubt that some of those trees for sure had the coax cable, and others might have had the plug or whatever, like this. So all of that could have been brought out and presented to the jury. So it's not like she didn't compare the wrong thing. She just might have used an overly broad subset where not everything would be covered by this particular claim. And so why isn't that the kind of thing that should just go to the jury for the jury to sort out? Because she had to tailor it to this particular claim. That's why it's methodologically wrong, because that had to be done. From this court's precedent, from Gerritsen on down, you have to apportion down to the value of what is claimed. And she didn't do that. But she did, with like thumbs ups and thumbs down. I mean, you want her to quantify the apportionment? Why? Why? Who says that? I believe that's required. By what? By the law of apportionment. Which one? Well, you have to assign value to the features that are claimed that are not in prior. She's an economist. You know, her job is to simplify this for lay people. And so theoretically, she has considered the quantitative impact. She's an expert. Does she have to explain to the jury why she came up with the number more than telling them, I raised it for this. I lowered it for this. That's how I came up with this number. Why does she have to tell them what amount she raised it by and what amount she lowered it by? Because that's not apportionment. And she had to do apportionment. It's not apportionment for her to say, I raised it for this and I lowered it for this? That's right. That is not apportionment. No, it is. It's qualitatively apportionment. You just want to impose a quantitative requirement for apportionment. Well, when you're assigning value to a feature, that usually means money. That doesn't mean... Right. But she told the jury the dollar amount in the end. After all those ups and downs, she told them what she thought the ultimate dollar value was. So she did assign value. Well, that's true. But it's really the way she got there is not apportionment. It does not assign a portion of value to claim 15 separate from the unpatentable features. That's what she had to do. She didn't do it. Thank you. I appreciate this. Obviously, it's an important issue. I wouldn't have kept you up here for 12 extra minutes trying to work through it. So, Mr. Fleming. Good morning. You may have pleased the Court. Mark Fleming from WilmerHale together with Nora Zhu on behalf of Lewis Electric. I think this is a case where the standard of review really matters. This Court is not a jury. There are no issues of law in this appeal. The obviousness challenge is purely factual. There are multiple reasons why the jury could have found that Poly Group didn't carry its burden of proof by clear and convincing evidence. The Court only needs to find sufficient evidence of one of them in order to affirm. We can start with Motivation to Combine. Poly Group's expert testimony on Motivation to Combine was rushed, and it was cursory. The expert's only suggestion for why a skilled artisan would have been motivated to take a coaxial connector and combine it with the Loomis tree was because of this move from incandescence to LEDs in the market. But our expert, Dr. Dickens, explained without contradiction that there were a tremendous number of LED-appropriate connectors available. In fact, Poly Group concedes that in their reply brief in this Court on page 7. You could choose high voltage or low voltage. And so the question for the jury was, as this Court said in WBIP v. Kohler, whether a skilled artisan would have plucked one reference out of the sea of prior art for combination with the other reference. The question of motivation, which is factual, includes whether a skilled artisan would have picked a coaxial connector specifically as opposed to the hundreds of other electrical connectors they could have used. And the only reason to choose a coaxial connector was if you wanted to implement rotational independence because you already knew of the patented invention. That is hindsight. Our expert explained that to the jury. The jury could well have credited our expert over their expert's conclusory assertion. There wasn't any discussion by Mr. Jakes of secondary considerations. But that is an independent basis to affirm the verdict in this case. On objective indicia and on nexus, yes, Judge? There was also not discussion of, and I would like to have your view on this, I think, a fundamental question that stretches across both obviousness and damages, which is, what is the scope of the claim that we're interested in? They seem to assume that we only look at the limited difference between Claim 15 and the invalidated Claim 10 from which it depends. But that's not the view that I think you take. I think you say we have to look at all of Claim 15 in its totality, both for determining whether obviousness was proven here as a matter of law and for whatever damages analysis. Do I understand your position? You understand that perfectly, Judge Stark. Can you help me? Why do you think you're right on that? If Claim 10 stands, as I think is conceded, stands as invalid today, why don't we only look at the incremental difference between Claim 10 and Claim 15? I think this Court has answered that question in the intervening decisions on which we put in 28J letters, DDR, CROI, and Inland Diamond, that because the invalidation occurred under two different legal regimes, because it was an IPR appeal, so Claim 10 was construed under its broadest reasonable interpretation, which, of course, does not apply here, where the district court construed the limitations of Claim 10 under Phillips, and it specifically found that a different construction of independent of rotational orientation was appropriate. So there's no collateral estoppel based on the different claim construction and also a different burden of proof. In the IPR, Claim 10 was invalidated by a preponderance of the evidence. Here, invalidation would have to be by clear and convincing evidence. So as this Court said most recently in Inland Diamond, you know, not even two months ago, those are the two reasons why an invalidation of Claim 10 has no collateral estoppel effect regarding validity in this case. With respect to damages, it's the same. Actually, on both, for obviousness, you can look at WBIP v. Kohler. For damages, you can look at Askazeneca v. Apotex. Or Judge Bryson's opinion for the district court in Prolitech, they both say this. What you look at is the novel combination of features. It is not the case that you just ignore everything that was, you know, by hypothesis in the prior art and just look at what the dependent claim added. You look at the novel combination of features, which is the phrase this Court has used over and over again. And here, the novel – I'm sorry, Your Honor. So the apportionment question here, first of all, you agree that apportionment is required, right?  But the apportionment, if I understand correctly, if I were to agree with what you just said about the scope of the claim we're issued, we're interested in, the expert needs to apportion down to the value created by Claim 15 as a whole, not just the difference between Claim 15 and Claim 10. Is that what you're saying? Well, so the answer is yes. And I want to just be very clear about what we're talking about when we say Claim 10. We mean Claim 10 as it was construed and invalidated in the IPR and the IPR appeal. So we do not mean the version of the limitations of Claim 10 construed under Phillips, which has not been appealed. And that's what the district court applied here. And so what that means is the invent, the innovation of Claim 15 over what was invalidated in Claim 10 is not just the coaxial connector, but it's the coaxial connector in implementing in rotational independence. So the ability to put the trunk pieces together, regardless of how they're oriented and you make the mechanical and the electrical connection at the same time. That is how the district court construed this claim. They haven't appealed that. So as this case comes to the court, that is the innovation against which objective condition need to be measured and for purposes of apportionment. And that is exactly what our expert apportioned to. I'm happy to go to that, but I do want to plant a flag for objective indicia because that is something that the jury had in front of it. I beg your pardon? Move on. Don't, don't talk about objective. You're not going to win on it because you don't show a nexus and you don't have a limited amount of time. And I'm hoping not to have to give you 12 minutes over like I did, Mr. Jakes, but it was valuable. But I don't want to spend my wheels on stuff that isn't valuable. So focus on what is. I would welcome an opportunity to convince you, but if I'm not going to, I know to take the hint. I think the easiest way through the damages issues is to recognize that Ms. Riley's comparable license approach, the market approach, was fully supported by Mr. Loomis' license to the 042 patent, which Poly Group has never denied, is comparable to the hypothetical negotiation. We raised this in our brief. They didn't respond in reply. They can't dispute that Mr. Loomis' 042 patent is comparable to the hypothetical negotiation because their own damages expert, Ms. Davis, relied on a license to the 042 patent as a comparable. Now, it was a sham license because Poly Group already owned that patent when they signed the license. So the jury was entitled to disregard that license. But it shows why they aren't disputing, unlike what they say about H.S. Craft, they aren't disputing that a license to the 042 patent is comparable. Focus on the Boston Warehouse License Agreement. Poly Group's damages expert admits that that is a pure license agreement just to the 042 patent. The title is literally, Patent License Agreement. It's on 4796 of the appendix. The royalty in that license agreement is 5 percent. And on an average sale price for Poly Group trees of $100, that's $5. And that is exactly the number that Ms. Riley put in front of the jury. So even if Your Honors were to agree with what Mr. Jakes is saying about the H.S. Craft license, we don't think you should agree with him. But even assuming arguendo that you do, even if she had — even if all her testimony about H.S. Craft had been stricken retroactively, you still would wind up with sufficient evidence and certainly no abuse of discretion in allowing her to testify to a $5 figure because it was fully supported by the Loomis licenses. So as the district court found, and this is on page 25, even if there had been any problem with her analysis of the H.S. Craft license, it would have been harmless. And they have not challenged that as an abuse of discretion at all. So any asserted error regarding H.S. Craft is at most a harmless error. I'll point out — I'll correct one thing Mr. Jakes said. Mr. Jakes suggested that our experts said that the H.S. Craft license was the most significant. She never said that. What she in fact said was she was asked which of these — those agreements are, plural, the most significant to your analysis. And then she mentioned not only the H.S. Craft license, but also four agreements that I also considered important. That's on page 1653. The district court, in its post-trial opinion, suggested that the H.S. Craft was the most significant, but that's not a correct statement of the expert testimony. And of course, in reviewing admission of the expert testimony, you look at the methodology the expert used, not its characterization by the district court. The — Mr. Jakes mentioned the Prolatec case. Again, I think Ms. Riley did exactly what Judge Bryson in that opinion called for. She apportioned to the value of the, quote, novel combination of features, which is the implementation in which mechanical and electrical connection are made simultaneously, regardless of rotational orientation. This issue about the one — the limited run of one-plug trees that did not use coaxial connectors, that is something that Ms. Riley excluded from the category of one-plug trees in her analysis. She expressly excluded it. It's on 4486 footnote 9 of her report. She explains there were seven models branded as one-plug that did not fully embody Claim 15. For purposes of her analysis, they were not identified as one-plug products. That is how she dealt with it. She could have been cross-examined on this. She was not. Could you clarify this issue of — the district court also provided no citation for a statement that not all one-plug trees practiced Claim 15 because some use non-coaxial connectors? Is that true, or is that only the old trees from way back 2000 — before 2012? It's — it's true in a limited sense in that there were some trees that were branded as one-plug that used a fixed alignment connector. And I'll explain why in a moment. But I want to be very clear. The damages expert, Ms. Riley, did not include those as one-plug trees in her analysis. She expressly excluded them. That's footnote 9 on 4486. She wasn't crossed on this. The cross-examination of Ms. Riley was very short, 19 pages. And they didn't mention this at all. They could have, but they didn't. The reason that it happened the way it did is because Lowe's made a last-minute request for a tree that had incandescent lights with the one-plug connection. Billis Electric wasn't able to do that in time. So what they did was they provided a fixed alignment one using two prongs. Lowe's didn't like that. Lowe's complained about that. They were clear that they wanted coaxial. That's 1539 and 40, and 1569 and 70, the testimony of Mr. Chen. So there's no evidence whatsoever that either, whether we talk about industry praise or commercial success, or whether we talk about damages, that there was any interest in a non-coaxial one-plug tree. It was a very limited run, and that's why she excluded it from her analysis. There's plenty of evidence that Ms. Riley relied on to show that customers valued the coaxial connectors more than fixed alignment. I mentioned that Lowe's complained about the limited run of fixed alignment trees that they got in 2012. Ms. Riley, in her report, this is 4392, cites customer feedback. Was her report before the jury? Not before the jury, but this is a 7 and 2 challenge to her methodology. So we certainly look at the report. That's the whole point of the report. She's not required to testify to everything to her report in order to defend against a methodological challenge, particularly one after the fact, that's bringing up issues that were not raised at Daubert and were not the subject of any trial objection. We cite the global traffic case and Federal Rules of Evidence 705 for that. They have no authority on the other side, and I think it would be remarkable if, once a methodological challenge came up after trial, we couldn't rely on the  So if you look at paragraph 274 of her report, she says, she cites customer feedback that the fixed orientation tree was a nightmare to assemble because it is hard to align the plugs while holding a very heavy section of the tree. Polygroup's own evidence showed the advantages of coaxial connectors over fixed alignment. They ran a survey where 97 percent of their respondents said the infringing quick set technology was an appealing feature. Ninety-eight percent were willing to pay more for it. Some said they'd pay over $25. This is 12829. Polygroup's own CEO admitted in his deposition, which the jury heard, that a rotationally independent design was drastically different and a big improvement on a fixed alignment design because, quote, I like the fact that you can plug it in in any direction and start the insertion in any direction. That is apportionment directly to Claim 15. It is the rotational independence that is enabled by use of a coaxial connector. Polygroup's own patent application in 2011 says that. And Ms. Riley summarized it for the jury on 1666. This is all goes to sort of it's really nice. It's a big part of what we like about the tree. But what do you say to your opponent's argument about the sort of confounding features of what when comparing the one-plug trees, for example, there's other aspects that weren't taken into account, the shape, size, number of lights, et cetera, of the one-plug trees versus the non-one-plug trees? Thank you, Your Honor. They most certainly were taken into account because they were done using an average. So those other features, whether the tree is of a different color, whether it has flocking, whether it has berries on it, what kind of lights it has. You had one-plug trees that had those different features. You had non-one-plug trees that had those features. The theme in their advocacy is that the one-plug trees had all the high-end features and the non-one-plug trees were the cheap versions. That's not the case. There's no witness ever said that. And if you look at Table 10.2 to Ms. Riley's report, she itemizes all the different products that she looked at and they all show they have different colors, different flocking features, different berries, different needle styles. Did she explain how she treated those different features? She averaged them out, which is what she would do when you had some infringing products or some... Did she explain she averaged them out in her report? Oh, yes, most certainly. And that's not disputed. I don't think that she averaged them out. She put slides in front of the jury showing that she averaged them out for each year during the damages period. And those features, you can have them in the one-plug version, you can have them in the non-one-plug version. And that's how you account for them by saying, all right, we have the infringing trees, we have the non-infringing trees. We average them out together. The difference between the two is allocable to the claimed invention. Now, Polygroup may not like the results. They could have cross-examined her on that. They put in an opposing expert witness who did their own analysis. But that's not an abuse of discretion to let that methodology in. That's a valid methodology for apportioning to the infringing technology. What about the argument that I had with Mr. Jakes, or the portion of the argument, his argument, where we were discussing the thumbs-up, thumbs-down concept? He was suggesting that an expert fails to adequately apportion and should be methodologically struck if that expert doesn't quantitatively assess, and only qualitatively assesses, at least in their testimony. Because we assume the expert has quantitatively assessed, even if that quantity isn't made clear in the testimony or even the expert report. Do you think that amounts to a methodological flaw that ought to cause an expert's opinion to be struck? That failure to apportion, because they're just, when they do this thumbs-up or thumbs-down or arrow-up or arrow-down, that isn't adequately explaining what the quantification process ought to be? I think it will depend on the situation, frankly. And again, I think the standard of review does matter. I mean, if you were reviewing a district judge who had decided to exclude testimony, relying on that kind of a theory, I think you'd be in a different position from where you are here, where you're reviewing for abuse of discretion, the denial of a new trial motion. There may well be, if all the expert does is say, I consider the Georgia-Pacific factors, and here's where I wound up, then maybe that isn't enough. No, but I, okay, here's where I wound up, and that resulted from me starting with this license at this rate. And then I would have raised the percentage rate for these reasons. I would have lowered the percentage rate for these reasons. Here's where I end up. Without quantifying how much you would raise for those reasons and how much you would, like, you know, obviously, I guess, one could surmise the delta, because there's where you started and where you ended up. But how do you question the expert on how much to increase or how much to decrease and what factors went into it? I mean, I think, as the question Your Honor asked and Mr. Jay sort of points out, you would very, if an expert offers a number, it does sound somewhat speculative. Say, go up, well, I'm going to go up by 1 percent or I'm going to come down by 3 percent. There might be reasons in an individual case to do that. There might be evidence supporting doing that. But another way to do it is to say, these are the factors that go one way, these are the factors that go another way, some of them cancel out, and so this puts me at the higher end of the range or the lower end of the range. Remember, she didn't just say you don't think she needed to quantify the things that made her go up or down, exactly how much each individual thing made her go up or down. Not in the context of her opinion in this case, and here's the reason why. It wasn't just let's go up or down starting from one license, right? She had the income approach where she assessed the incremental profit. I know, but divorce the other approaches. Focus on this question. Well, but they're all put together, right? That's how she used Georgia-Pacific, where she developed a range using the two other approaches. She started at the profit analysis, led to a range of $430 to $20. She then looked at the comparable licenses and used that to constrain the range, so she went up with a range between $430 and $5. Very tight range, right, but $4 to $5. And then she used Georgia-Pacific to say, all right, where in that range do I think the parties would have come out in the hypothetical negotiation? And there she said it's going to be the higher end. You're just totally not answering my question. I need you to. Is there a methodological flaw with an expert saying I would have gone up or down up for these reasons, down for those reasons. Here's where I start. Here's where I end up. Is that methodologically unsound if the expert doesn't, for the jury, quantify how much up, how much down, or is that something that she, he or she can be crossed on? And if she, at the end of the day, has no answer, then of course there's a methodological problem. Like if she says, oh, well, how much, well, you know, that's a problem. But is there a problem with us not knowing or her not presenting as part of her testimony how much up and how much down for each individual thing? I don't think this court has ever suggested that that is something that needs to be done in the method, as a condition of admission and certainly not as an abuse of discretion to let it in. I can't think of a case where this court has said that. In fact, I think we have cases where, I'm sure you know, it often happens that district court that the expert will say they exactly cancel each other out. Or as a conservative estimate, against my client's interest, I'm going to say they exactly cancel each other out. And I don't recall us ever saying that that's a methodological error. I have a similar lack of recollection. But again, I think the easiest way through this would be to point out that even if you disregarded everything she said, even if that should have been stricken retroactively, but for the reliance on the comparable licenses between Mr. Loomis and GTI on the one hand and Boston Warehouse on the other, for the comparable 042 patent, which they've never denied, is comparable. That was a 5 percent royalty on the sale of each tree. And that, on a $100 average price for Poly Group, which they've also never disputed, gives you the $5. The jury, of course, awarded less than that, as was its right. Unless the court has further questions, we would respectfully request that the judgment be affirmed. Okay, thank you. Thank you, Ron. I think you've heard most of what I have to say, but I'll just make a couple of points. One on the motivation to combine. Counsel pointed out the experts said that there were many connectors that could have been used. That may be true. The fact is, he also said that barrel connectors were standard, readily available, common. It's not really a selection case. On the question of rotational independence and what's the scope of Claim 15, does it include Claim 10? We recognize the recent cases say there's no estoppel as to the board's findings. We might disagree with that for the reasons that were expressed in the dissent in the Croy case. But you don't have to really, it doesn't turn on that, because if you have the Loomis JKI tree and a coaxial connector, you meet all the limitations of Claim 15, whatever they are. Rotational independence, they throw in one step, Loomis was a one-step tree as well. So regardless, the prior art taught all those limitations. So there's not something, it's some distinguishing feature. Also, with respect to Claim 10, Claim 10's in the public domain. Anyone is free to use Claim 10 without a barrel connector. So that's why the apportionment has to be done down to Claim 15. On the HS Craft license, counsel suggested that even if that is thrown out and the expert didn't do the correct apportionment, that would be harmless error. It can't be harmless error. There may be other evidence that they rely on, but even if it was one of the significant licenses, having that in front of the jury is not harmless error, and we should get a new trial for that fact alone. I don't understand that point. Why? If she said that there were five licenses that drove her thinking about it, and the other four are right on point, and there's a word on this one, simply because she didn't explain the difference in value attributed to Claim 10 versus Claim 15, or the three patents versus the one patent, why does that amount to harmless error? It's not harmless error. I mean, why does it amount to harmful error? Sorry. Because she said it was a significant license. It was her starting point. She said there were five significant licenses. That's true, but it was one of the significant ones. We don't know what the jury relied on. If they could have relied on that, that's harmful error. If you give a jury two theories and one of them is bad... But that's not two theories. That's two facts. These licenses are each facts. The licenses are a statement of fact about what somebody else was willing to pay. So are you saying you think her opinion would have been different if she could only have properly relied on four licenses as opposed to five? It could have been, but it's not just her opinion. Inadmissible evidence taints the jury. I don't see how that license is inadmissible. You complained that she failed to articulate apportionment theory. That doesn't make the evidence inadmissible. Well, to use that license, she had to do that. See, I disagree with you on this fundamental point. I think you can introduce licenses and you don't even need an expert. I don't think you need a patent expert. I don't understand what law has ever said you must have an expert to explain to a jury. A lawyer could say, look, everybody else paid 5%. You should just be paying 5% too. Well, this court has said that it's the burden of the patent owner to the proponent of the license agreement to show that it's comparable. So simply introducing the license agreement is not enough. They have to show that it's comparable. This court has said that. It's their burden as the proponent. The one-plug versus non-one-plug. The only evidence in front of the jury was that there were non-coaxial one-plug trees buried in her expert report in a footnote in hundreds of pages. She says she separated that out. That never came out. That's just looking back at the expert report that was not admitted. But why does it have to come out if it's true? Why, if she actually separated them out, and what she was presenting to the jury was the separate category, who cares that she didn't tell the jury how she separated them out? Because the only thing the jury heard was that there are one-plug trees that are not coaxial. But she only presented a value for the ones that were separate and actually had the patented coax. But the jury didn't know that. They were told that the only one-  It would have been a relevant fact. Why? It doesn't matter what she labeled them. You say she should have said, I'm giving you a number that represents the value of one-plug trees. And you're saying she should have said, I'm giving you a number that represents the value of one-plug trees using the coaxial cable. Yes. But why if the number is the same? She presented the right number to the jury. There's no question that she presented the right number based on her expert report in that footnote. Because the jury was otherwise told that one-plug included non-coaxial trees. If you thought that was a relevant fact for the jury to know, you could have brought it out, couldn't you? I could have, yes. And finally, there's a suggestion that we didn't make this argument on Daubert about comparability. We did argue it after trial, and Willis's response was, it's the same as what you said in your Daubert motion. Thank you. Okay. I thank both counsel. This case is taken under submission.